## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## CHICAGO DIVISION

JANE DOES (N.A.M.), (K.J.W.), (M.J.R.),
(S.S.H.), (M.S.H.), (N.D.H.), (M.H.), (J.S.H.),
(S.L.H.), (S.F.H.), (C.I.H.), (K.M.H.), (J.H.),
(D.M.H.), (M.A.H), (M.D.H.), (A.H.G.),
(R.H.), (R.D.H.), (D.D.J.), (A.M.J.), (L.D.J.),
(M.D.J.), (M.L.J.), (K.A.J.), (N.R.K.),
(C.C.K.), (C.T.K.), (A.M.L.), (M.D.L.),
(M.R.M.), (S.A.M.), (C.L.M.), (A.G.M.),
(S.S.M.),  (A.N.M.), (S.A.H.), (T.D.M.),
(T.L.M.), (N.N.M.), (S.M.M.), (C.M.M.),
(N.M.), (A.L.M.), (K.A.N.), (N.E.N.),
(S.M.N.), (D.R.N.), (M.L.O.), (N.A.O.),
(M.E.O.), (A.G.O.), (T.K.P.), (J.A.P.),
(K.R.P.), (C.C.P.), (M.L.P.), (P.A.S.), (J.A.S.),
(E.J.S.), (A.N.T.), (S.A.T.), (A.C.T.), (B.N.T.),
(S.N.T.), (E.E.V.), (T.J.W.), (A.M.W.),
(J.K.W.), (N.D.W.), (A.D.W.), (B.T.W.),
(R.N.W.), (B.M.W.), (V.F.W.), (S.S.W.),
(A.N.W.), (R.C.W.), (M.T.Y.), and (S.R.Z),

     Plaintiffs,

v.                                  CIVIL ACTION NO. 1:25-cv-6872

SALESFORCE, INC.,
    Defendant.

## PLAINTIFFS' ORIGINAL COMPLAINT

Comes now, Jane Does (N.A.M.), (K.J.W.), (M.J.R.), (S.S.H.), (M.S.H.), (N.D.H.), (M.H.),

(J.S.H.), (S.L.H.), (S.F.H.), (C.I.H.), (K.M.H.), (J.H.), (D.M.H.), (M.A.H) (M.D.H.), (A.H.G.),

(R.H.), (R.D.H.), (D.D.J.), (A.M.J.), (L.D.J.), (M.D.J.), (M.L.J.), (K.A.J.), (N.R.K.), (C.C.K.),

(C.T.K.), (A.M.L.), (M.D.L.), (M.R.M.), (S.A.M.), (C.L.M.), (A.G.M.), (S.S.M.),  (A.N.M.),

(S.A.H.), (T.D.M.), (T.L.M.), (N.N.M.), (S.M.M.), (C.M.M.), (N.M.), (A.L.M.), (K.A.N.),

(N.E.N.), (S.M.N.), (D.R.N.), (M.L.O.), (N.A.O.), (M.E.O.), (A.G.O.), (T.K.P.), (J.A.P.), (K.R.P.),

(C.C.P.), (M.L.P.), (P.A.S.), (J.A.S.), (E.J.S.), (A.N.T.), (S.A.T.), (A.C.T.), (B.N.T.), (S.N.T.),

(E.E.V.), (T.J.W.), (A.M.W.), (J.K.W.), (N.D.W.), (A.D.W.), (B.T.W.), (R.N.W.), (B.M.W.), (V.F.W.), (S.S.W.), (A.N.W.), (R.C.W.), (M.T.Y.), and (S.R.Z), Plaintiffs in the above-styled and numbered cause, and files this Original Complaint complaining of Defendant, SALESFORCE, INC., and respectfully shows the Court as follows:

## I. SUMMARY OF CASE

1.     Sex trafficking is a public health crisis that has hit epidemic proportions in our communities, resulting in a devastating effect on its survivors and a crushing financial effect on our world.

2.     This is a case about tech companies knowingly benefitting from the proliferation and promotion of sex trafficking.  Law enforcement will never have a chance at defeating or reducing this crisis if tech companies are able to continue to actively facilitate the promotion of criminal activity without accountability.

3.     Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[1]

4.     The exploitation of victims of sex trafficking and prostitution most often does not occur solely at the hands of the traffickers and sex buyers. Rather, technology companies often play an equal hand in the exploitation of these victims.

5.     Congress has recognized the complex nature of trafficking and prostitution ventures by creating laws that go beyond liability for just the sex buyer and trafficker to address the critical role companies like Salesforce play in facilitating exploitation and sex trafficking.  It is by and

---

[1] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38, https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/ publication/wcms_575479.pdf.

through these laws that Plaintiffs brings their lawsuit.

### The Role of Big Tech

6.  Formerly, the sale of sex occurred face to face. If a buyer wanted to purchase sex, they would have to leave their home or hotel, locate the victim and conduct the transaction in person. With the development of technology, that is no longer the case. Technology has transformed the commercial sex trade, and, in the process, has contributed to the explosion of domestic sex trafficking and compelled prostitution.

7.  Backpage.com ["Backpage"] was the leading online marketplace for the sale of sex and sex trafficking prior to being seized by the FBI in April of 2018. "Shutting down the largest online U.S. marketplace for sex trafficking will dramatically reduce the profitability of forcing people into the commercial sex trade, at least in the short term," said Bradley Myles, chief executive of Polaris, an international anti-slavery group that runs the National Human Trafficking Hotline.[2]

8.  The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors." [3]

9.  Backpage was involved in the overwhelming majority of all child-sex trafficking reports received from the general public by the National Center for Missing and Exploited Children.

10.  Thus, it was repeatedly reported and was public knowledge at all relevant times that Backpage was a sex trafficking website.

---

[2]  https://www.reuters.com/article/us-usa-backpage-justice/sex-ads-website-backpage-shut-down-by-u-s-authorities-idUSKCN1HD2QP
[3]  See https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2011/NAAG_Backpage_Signon_08-31-11_Final.pdf, and the press release at https://www.atg.wa.gov/news/news-releases/attorneys-general-backpagecom-prove-you-re-fighting-human-trafficking

11.     During 2013-2015, Backpage earned over 99% of its revenue from adult ads, a substantial percentage of which came directly from on-line prostitution and sex trafficking.[4]

12.     Salesforce, a technology company, is undisputedly one of America's greatest technology innovators, creating powerful and effective tools that have revolutionized business function and growth.

13.     In public, and on various social media platforms, Salesforce has boasted about fighting human trafficking. In reality, however, Salesforce created, owned, controlled, maintained, and provided to Backpage the Customer Relationship Management ("CRM") technology that facilitated the growth of Backpage and the trafficking of untold thousands on its website. Ultimately, the customers that Salesforce's CRM technology was used to grow, service and manage were traffickers and sex buyers.

14.     Salesforce sold, managed and serviced this technology despite knowing of the illicit and unlawful conduct Backpage was promoting and participating in. Simply, Salesforce supplied Backpage with the specialized CRM tools, support, and technical expertise needed to operate and grow its on-line selling of sex and sex trafficking business that ensnared Plaintiffs and others.

15.     During a relationship that spanned more than 5 years, Salesforce had sufficient exposure to information about the nature of Backpage's business that Salesforce knew or should have known that Backpage was an illegal sex trafficking website where victims were advertised for commercial sex and forced to engage in commercial sex by means of force, fraud, coercion, or threats of force, fraud, or coercion. This knowledge came from not only the advertisements, but other sources as well.

---

[4]https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Re
dacted.pdf (at *11).

16. While law enforcement, Congress, the Attorneys General and legislatures were fighting to stop Backpage, Salesforce behind the scenes continued to aid in Backpage's growth.

17. While Backpage's role has become public knowledge, the role of those who facilitated Backpage, like Salesforce, had yet to be revealed until now.

18. Technology companies can no longer divorce themselves from the technologies they create and platforms they assist and support when they are being used in an unlawful, harmful, and costly manner.

19. This is not a case where Salesforce simply put a neutral product in someone's hands, or unwittingly provided electricity to Backpage's building, or delivered office supplies, or sold an off the shelf product, but is a case where Salesforce directly assisted a known trafficking and pimping business to expand its operations.

20. Both before and during this relationship, Salesforce was exposed to overwhelming evidence regarding the nature of Backpage's business – including the clear signs contained within the ads posted on Backpage that the victims in the advertisements were being advertised for commercial sex acts under force, fraud or coercion—and therefore Salesforce knew or should have known that Backpage operated an unlawful sex trafficking venture from which Salesforce gained financial benefit.

**The Solution**

21. Technology companies have consistently tried to shield themselves from liability for their participation in the human trafficking crisis with the Communications Decency Act ("CDA"). The CDA was passed to protect children from online pornography and was never intended to protect technology companies from being held accountable for sex trafficking.

22. Relatedly, the Trafficking Victims Protection Act (TVPRA) was enacted to extend liability for sex trafficking beyond the primary actors to others who knowingly benefited by facilitating sex trafficking.

23. The criminal justice system has been bearing the cross in the fight against the selling of sex and sex trafficking for far too long by prosecuting the traffickers, prostitution promoters, and sex buyers. It is now time for the civil justice system to hold those who profit from this sex trafficking and prostitution industry accountable for their wrongful conduct.

## II.     JURISDICTION & VENUE

24. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1581, *et seq.*

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this District and Division and Defendant Salesforce resides in this District.

26. Salesforce is a Delaware corporation with its principal place of business in California, and has been doing business in Illinois as a foreign corporation registered with the Illinois Secretary of State since April 4, 2007.

27. The venture between Salesforce and Backpage.com that trafficked Plaintiffs was formed in this District and Division, by Defendant Salesforce through Salesforce's Chicago office. Therefore, venue is proper in this Court.

28. At the time the venture between Backpage and Salesforce was formed, key Salesforce personnel assigned to the account were working in the Chigaco Salesforce office.

29.    The contract negotiation, product selection and service support were negotiated through the Chicago Salesfore office.

30.    The Salesforce account executive, regional manager and area vice president that finalized the Salesforce-Backpage venture were all working with Backpage from the Chicago Salesforce office.

31.    Mark Raymo was the initial account executive with Salesforce in its Chicago office who sold products and services to Backpage that grew, promoted, and facilitated Backpage's trafficking operation.

32.    Salesforce assigns one account executive to be the primay contact between their client and Salesforce during the contract relationship. During the initial contract negotiations and signing of the initial contract, that person was Mark Raymo.

33.    Adam Johnson was Salesforce's Regional Manager of Commericial Sales in its Chicago office who supervised the account executive and assisted in selling products and services to Backpage that grew, promoted, and facilitated Backpage's website.

34.    Kevin Meagher was Salesforce's Regional Vice-President based in Salesforce's Chicago office who supervised the account executive and regional manager and assisted in selling products and services to Backpage that grew, promoted, and facilitated Backpage's website.

35.    Salesforce is registered to do business in Illinois and has been since at least 2007 and maintains offices in Illinois to facilitate its business operations.

36.    Salesforce has purposefully availed itself of the laws, benefits, and privileges of doing business in Illinois since 2007.

37.    Salesforce operates and conducts business in Illinois, which included (at all relevant times) providing services and products to companies such as Backpage.

38. The exercise of specific personal jurisdiction over Salesforce in Illinois comports with the notions of fair play and substantial justice, because a substantial amount of activity giving rise to the facts in this Complaint originated in Chicago, Illinois at the Salesforce office located there.

39. Illinois is a convenient and effective forum because the contract between Salesforce and Backpage that facilitated Plaintiffs' trafficking was conducted from Salesforce's Chicago office, where several employees of Salesforce were actively involved in and managed the accounts of Backpage.

40. The exercise of specific personal jurisdiction over Salesforce in Illinois comports with the notions of fair play and substantial justice, because a substantial amount of activity giving rise to the facts in this Complaint originated in Chicago, Illinois at the Salesforce office.

41. The exercise of specific personal jurisdiction over Salesforce in Illinois is consistent with the due process requirements of the Constitutions of both the United States and Illinois.

42. For these reasons, specific personal jurisdiction over Salesforce is proper.

### III. THE PARTIES

44. Plaintiff N.A.M. is a natural person who is a resident and citizen of Michigan.

45. Plaintiff K.J.W. is a natural person who is a resident and citizen of Washington.

46. Plaintiff M.J.R. is a natural person who is a resident and citizen of Texas.

47. Plaintiff S.S.H. is a natural person who is a resident and citizen of Florida.

48. Plaintiff M.S.H. is a natural person who is a resident and citizen of Indiana.

49. Plaintiff N.D.H. is a natural person who is a resident and citizen of California.

50. Plaintiff M.H. is a natural person who is a resident and citizen of New York.

51. Plaintiff J.S.H. is a natural person who is a resident and citizen of Georgia.

52. Plaintiff S.L.H. is a natural person who is a resident and citizen of Maryland.

53. Plaintiff S.F.H. is a natural person who is a resident and citizen of Washington.

54. Plaintiff C.I.H. is a natural person who is a resident and citizen of Kentucky.

55. Plaintiff K.M.H. is a natural person who is a resident and citizen of New Jersey.

56. Plaintiff J.H. is a natural person who is a resident and citizen of Georgia.

57. Plaintiff D.M.H. is a natural person who is a resident and citizen of Arkansas.

58. Plaintiff M.A.H. is a natural person who is a resident and citizen of Missouri.

59. Plaintiff M.D.H. is a natural person who is a resident and citizen of California.

60. Plaintiff A.H.G. is a natural person who is a resident and citizen of Colorado.

61. Plaintiff R.H. is a natural person who is a resident and citizen of Washington.

62. Plaintiff R.D.H. is a natural person who is a resident and citizen of Kentucky.

63. Plaintiff D.D.J. is a natural person who is a resident and citizen of Texas.

64. Plaintiff A.M.J. is a natural person who is a resident and citizen of Nevada.

65. Plaintiff L.D.J. is a natural person who is a resident and citizen of Minnesota.

66. Plaintiff M.D.J. is a natural person who is a resident and citizen of Arizona.

67. Plaintiff M.L.J. is a natural person who is a resident and citizen of Washington.

68. Plaintiff K.A.J. is a natural person who is a resident and citizen of Ohio.

69. Plaintiff N.R.K. is a natural person who is a resident and citizen of Wisconsin.

70. Plaintiff C.C.K. is a natural person who is a resident and citizen of Georgia.

71. Plaintiff C.T.K. is a natural person who is a resident and citizen of Wisconsin.

72. Plaintiff A.M.L. is a natural person who is a resident and citizen of Kansas.

73. Plaintiff M.D.L. is a natural person who is a resident and citizen of Kansas.

74. Plaintiff M.R.M. is a natural person who is a resident and citizen of Georgia.

75.    Plaintiff S.A.M. is a natural person who is a resident and citizen of Washington.

76.    Plaintiff C.L.M. is a natural person who is a resident and citizen of California.

77.    Plaintiff A.G.M. is a natural person who is a resident and citizen of California.

78.    Plaintiff S.S.M. is a natural person who is a resident and citizen of Florida.

79.    Plaintiff A.N.M. is a natural person who is a resident and citizen of Colorado.

80.    Plaintiff S.A.H. is a natural person who is a resident and citizen of Ohio.

81.    Plaintiff T.D.M. is a natural person who is a resident and citizen of Georgia.

82.    Plaintiff T.L.M. is a natural person who is a resident and citizen of Illinois.

83.    Plaintiff N.N.M. is a natural person who is a resident and citizen of Minnesota.

84.    Plaintiff S.M.M is a natural person who is a resident and citizen of California.

85.    Plaintiff C.M.M is a natural person who is a resident and citizen of Oregon.

86.    Plaintiff N.M. is a natural person who is a resident and citizen of Arkansas.

87.    Plaintiff A.L.M. is a natural person who is a resident and citizen of Massachusetts.

88.    Plaintiff K.A.N. is a natural person who is a resident and citizen of Texas.

89.    Plaintiff N.E.N. is a natural person who is a resident and citizen of California.

90.    Plaintiff S.M.N. is a natural person who is a resident and citizen of Oregon.

91.    Plaintiff D.R.N. is a natural person who is a resident and citizen of California.

92.    Plaintiff M.L.O. is a natural person who is a resident and citizen of Iowa.

93.    Plaintiff N.A.O. is a natural person who is a resident and citizen of Indiana.

94.    Plaintiff M.E.O. is a natural person who is a resident and citizen of Wisconsin.

95.    Plaintiff A.G.O. is a natural person who is a resident and citizen of Illinois.

96.    Plaintiff T.K.P. is a natural person who is a resident and citizen of Oklahoma.

97.    Plaintiff J.A.P. is a natural person who is a resident and citizen of Washington.

98.  Plaintiff K.R.P. is a natural person who is a resident and citizen of Kentucky.

99.  Plaintiff C.C.P. is a natural person who is a resident and citizen of Kentucky.

100.  Plaintiff M.L.P. is a natural person who is a resident and citizen of Arkansas.

101.  Plaintiff P.A.S. is a natural person who is a resident and citizen of Florida.

102.  Plaintiff J.A.S. is a natural person who is a resident and citizen of Georgia.

103.  Plaintiff E.J.S. is a natural person who is a resident and citizen of Maine.

104.  Plaintiff A.N.T. is a natural person who is a resident and citizen of New York.

105.  Plaintiff S.A.T. is a natural person who is a resident and citizen of Texas.

106.  Plaintiff A.C.T. is a natural person who is a resident and citizen of California.

107.  Plaintiff B.N.T. is a natural person who is a resident and citizen of Georgia.

108.  Plaintiff S.N.T. is a natural person who is a resident and citizen of Georgia.

109.  Plaintiff E.E.V. is a natural person who is a resident and citizen of Minnesota.

110.  Plaintiff T.J.W. is a natural person who is a resident and citizen of Texas.

111.  Plaintiff A.M.W. is a natural person who is a resident and citizen of Oregon.

112.  Plaintiff J.K.W. is a natural person who is a resident and citizen of Florida.

113.  Plaintiff N.D.W. is a natural person who is a resident and citizen of Ohio.

114.  Plaintiff A.D.W. is a natural person who is a resident and citizen of Illinois.

115.  Plaintiff B.T.W. is a natural person who is a resident and citizen of New York.

116.  Plaintiff R.N.W. is a natural person who is a resident and citizen of Georgia.

117.  Plaintiff B.M.W. is a natural person who is a resident and citizen of Missouri.

118.  Plaintiff V.F.W. is a natural person who is a resident and citizen of Arizona.

119.  Plaintiff S.S.W. is a natural person who is a resident and citizen of Michigan.

120.  Plaintiff A.N.W. is a natural person who is a resident and citizen of Texas.

121.    Plaintiff R.C.W. is a natural person who is a resident and citizen of Washington.

122.    Plaintiff M.T.Y. is a natural person who is a resident and citizen of Washington.

123.    Plaintiff S.R.Z is a natural person who is a resident and citizen of Texas.

124.    Salesforce is a foreign corporation organized under the laws of Delaware with its principal place of business in California. Salesforce may be served by delivering a summons to its registered agent, CT Corporation System, 208 S. La Salle St, Ste 814, Chicago, IL 60604-1101.

125.    All references to Salesforce include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

## IV.    ASSUMED OR COMMON NAME

126.    Plaintiffs bring this petition against the Defendant in their assumed or common name and expressly reserves the right to substitute the true name of any Defendant if needed or in response to Court Order. Moreover, Plaintiffs expressly invokes the right to amend under the doctrine of misnomer if any Defendant has been properly served but were done so under the wrong legal name.

## VI.    FACTS REGARDING SALESFORCE'S FACILITATION OF BACKPAGE TRAFFICKING

### A.    Backpage and Sex Trafficking[5]

---

[5] Significant portions of this pleading are based on information found in the report from the U.S. Senate Permanent Subcommittee on Investigations entitled *Backpage.com's Knowing Facilitation of Online Sex Trafficking*, Senate Report. ("Senate Report"). See also Backpage Guilty Pleas and the Verified Complaint in Case No. 2018-0838, Matthew P. Denn, *Attorney General of the State of Delaware v. Backpage.com, et al* (Nov. 11, 2018).

12

127.    Estimates are that by 2016, there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide. Int'l Labour Office, *Global estimates of modern slavery: Forced labour and forced marriage*, at 21, https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---ipec/documents/publication/wcms_854733.pdf.

128.    Historically, sex trafficking and prostitution took place out on the street. Now, most sex trafficking, including the trafficking of Plaintiffs, occurs online.

129.    With the development of modern technology, pimps and traffickers can reach entirely new audiences, evade law enforcement detection, and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

130.    During the late 2000s, it became apparent that classified ad platforms and social media sites were facilitating and profiting from pornography, commercial sex, and trafficking.[6]

131.    Backpage, as early as 2008, had been publicly identified by law enforcement, United States Attorneys General, and every United States Governor as the biggest and most notorious sex trafficking and prostitution promoting website in the United States.

132.    The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[7] By 2008, sex ads were prevalent on various websites, including the largest online marketplace: Craigslist. However, Craigslist in 2010 discontinued its "Adult" section as a result of pressure from law enforcement, anti-trafficking groups, and others. This was a turning point for Backpage, as described in the Senate Report:

---

[6] Human Trafficking Online: The Role of Social Networking Sites and Online Classifieds, Latonero, University of Southern California (2011), link at The Role of Social Networking Sites and Online Classifieds.
[7] https://www.hsdl.org/?view&did=797979

13

Beginning in 2008, Backpage experienced a period of "explosive growth" by "[o]ptimizing [its] geographic strategy" and "capitalizing on displaced Craigslist ad volume." Gross revenue increased from $5.3 million in 2008, to $11.7 million in 2009, and to $29 million in 2010. Revenue continued to grow significantly in the next decade, from $71.2 million in 2012, to $112.7 million in 2013, to $135 million in 2014. Due to its "highly profitable and scalable platform," Backpage's EBITDA margin (a measurement of operating profitability) was an enviable 69% in 2011 and a staggering 82% in 2014.[8]

133.    Backpage expressly capitalized on Craigslist's decision to prohibit the selling of sex on its platform, taking on the displaced ad volume for illegal sex advertising.

134.    The growth achieved by taking on the illegal business that Craigslist shutdown was communicated to Salesforce.

135.    By 2010, Backpage was the unchallenged leader in online advertising for human trafficking and prostitution.  For years, Backpage continued to profit from exploitation.  During 2013-2015, Backpage earned over 99% of its revenue from adult advertisements.[9]  Based on publicly available documents, Backpage earned approximately $71 million in revenue in 2012.  In the next 29 months, from January 2013 through May 2015, Backpage earned approximately $346 million in revenue, with nearly $340 million being from advertisements for commercial sex.

136.    Any person who looked at any publicly available Backpage content or did an internet search of the company would know immediately that Backpage was a purveyor of sex,

---

[8] Senate Report.
[9] Declaration in Support of Arrest Warrant and Warrant, *State v. Ferrer* (Cal. Super. Ct), https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf.

not a general online marketplace. In fact, Backpage was the largest and most notorious sponsor of commercial and coerced sex in the history of the internet.[10]

137. The posts on Backpage were replete with well recognized messages, signs and signals of commercial sex and sex trafficking. The "code words" used by traffickers and pimps are well recognized:

- Rates for services for the hour ("hr") and half hour ("hh") or by minute increments:

> SPECIALS
> 80~15MIN
> 100~30MIN
> 120~45MIN
> 160~60MIN. (2X THE RELIEF)

  o "GREAT DAYTIME SPECIALS!! Hour, Half-hour, Quarter hour"

  o "DAYTIME INCALL SPECIALS: 80 Quickie, 100 Half Hour, 15 Hour"

- Use of terms such as "roses" instead of using the term "dollars":

> Outcalls available.
> I'm available for all you HORNY guys.
> 160 roses for a FULL hour of my sweet uh… attention
> 120 roses for a Half hour 100% real photos of me
> 200 roses for outcall
> 340 roses for 2-girl Shows available with my friends
> And/Or dominatrix and submissive ladies available including me
> ***Brand new pictures***

- Code words for orgasms – "CuM N Give Me a TRY"

  o "CuM C WAt I hAVe To OFfeR"

  o "Kacey has a new place to Play u wanna CUM see…."

  o "Naughty A'lize When I Cum U Cum > Lets Get Nasty"

---

[10] *Id.*

15

- Phrases used to convey offers of sex:
  - "Sweet Sexy Blonde ready to rock your world!!!!!!!
  - "$80 ((SeXxXy….((W.E.T)
  - "READY for some steamy action with you…."

- Code words for intercourse – "GFE" – "Girl Friend Experience"
  - "I am a GFE provider!!"

- Additional euphemistic terms common to the online sex world:
  - "I AM … HOTT AND HORNEY…"
  - "CALL ME FOR THE BEST BANG FOR YOUR BUCK DADDY…."
  - "I AM A NASTY LITTLE GIRL AND AM EAGER TO SHOW YOU. I LOVE TO KISS IT DRY PAPY

- Offers for services "incall" – at the trafficker's location – or "outcall" – at a location selected by the "John" or customer.

- Use of terms designed to convey that the poster is young:
  - "HI IM AMBER VERY SWEET GIRL N LOVE 2 HAVE FUN…LOL…." – while the ad provides the victims age as "19"

- Other messages are less subtle:
  - "!!!!!INTO SoMeHOT Weekend SiNfUL PleasUrEs!!!!!"
  - "Don't you just feel like getting away to a nice discreet place and getting into some steamy sexy fun with a Hot Babe?
  - "Treat yourself to pure pleasure, relax, and savor our favorite erotic and sensual experience."
  - "I love to show my appreciation for gifts given to me."

o "Im willing to LEARN NEW THINGS!!!  Just please be gentle"

o I LOVE getting WILD so if you knew better you'll do better and give ALIZE A CALL"

o "Are u ready for this mind blowing experience …. I LOVE TO TRY LOTS OF THINGS!!!!!"

- Some posting were even more direct:

o "READY TO SCREAM 7 PLEASE…. BiG Dick ts with Phat Azz & Hot Mouth…."

138.    Not only did the written portions of the advertisements clearly show that the advertisements violated commercial sex and sex trafficking laws but the visual photographs and emojis that accompanied the ads also carried the tell-tale signs of sex trafficking.



139.  Even  to  the  untrained  eye,  the  Backpage  websit



e was a marketplace for unlawful commercial sex activity, commercial sex as a result of force,

fraud, and coercion, and sex trafficking.  Virtually every ad on Backpage catered to sex buyers.

140.  The signs of commercial sex and sex trafficking were present in virtually every add

on Backpage, including the advertisements for Plaintiffs.  Visible tattoos and branding including

crowns, roses, the trafficker's name, and dollar signs communicated clearly the purpose of the

advertisement.  These same widely recognized sex trafficking symbols and brands were often used

in the advertisements, further evidencing that the advertisements were offering services in

violation of sex trafficking laws.  Backpage fully understood the meaning of these symbols that

were often used in advertisements on the Backpage website, and Backpage knew that certain

symbols communicated that the person in the advertisement was a trafficking victim who was

unwillingly engaging in commercial sex acts as a result of actual or threatened force, fraud, or

coercion.

141.  Thus, Backpage fully understood that many of the advertisements on its website

served to sell sex trafficking victims.  Further, the content of the advertisements posted publicly

on the Backpage website put any reasonable viewer on notice that Backpage was a hub for sex trafficking. Advertisements on Backpage contained obvious indications that force, fraud, or coercion was being used or threatened against the victims in the advertisements to cause them to engage in commercial sex acts. The Senate Report on Backpage's knowing facilitation of online sex trafficking detailed a particular incident where a Backpage moderator reported an advertisement because "the girl or woman in the ad 'looked drugged and has bruises,'" which the Senate Report concluded were "obvious indications of trafficking."[11] A moderation supervisor for Backpage chastised the employee for reporting the post because Backpage deliberately avoided making reports as to trafficking on its website. The supervisor complained that "[t]hese are the kind of reports the cops question us about."[12]

142.    Given the content of many of the advertisements on Backpage—and the nature of many of the photographs on Backpage—it was open and obvious that many of the people in the advertisements on Backpage were unwilling victims of sex trafficking who were being caused to engage in commercial sex acts by fraud, force, or coercion. Although Backpage knew that victims were being trafficked through advertisements on Backpage's website and were engaging in commercial sex acts under force, fraud, or coercion, Backpage intentionally facilitated that illegal conduct in order to maximize its profits.

143.    Similarly, the content of many of the advertisements on Backpage, including the specific language used in the advertisements and the photographs of the victims, clearly conveyed that minors were being sold for sex on Backpage's website. And the Senate Report concluded that

---

[11] Senate Report at 40.
[12] *Id.*

"Backpage clearly understands that a substantial amount of child sex trafficking takes place on its website."[13]

144.    In addition to openly violating commercial sex laws, Backpage admitted to its role in the promotion of prostitution.  The investigatory and law enforcement efforts came to a head on April 6, 2018, when the United States Department of Justice ("USDOJ") announced that it had filed a 93-count, 61-page indictment in the United States District Court for the District of Arizona, charging the founders of Backpage - Michael Lacey and James Larkin - and other individuals heavily involved in Backpage's ownership and operations with:

(a)    one count of Conspiracy to Facilitate Prostitution (18 U.S.C § 371);

(b)    fifty counts of violation of the Travel Act – Facilitating Prostitution (18 U.S.C. § 1952(a)(3)(A) and (b)(1)(i));

(c)    one count of Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h));

(d)    ten counts of Concealment Money Laundering (18 U.S.C. § 1956(a)(1)(B)(i));

(e)    six counts of International Promotional Money Laundering (18 U.S.C. § 1956(a)(2)(A)); and

(f)    twenty-five counts of Transactional Money Laundering (18 U.S.C. § 1957).

The USDOJ filed a superseding indictment on July 25, 2018, adding an additional six counts of Transactional Money Laundering (18 U.S.C. § 1957) and one new count of International Concealment Money Laundering (18 U.S.C. § 1956(a)(2)(B)(i)), against Lacey and newly asserting Counts 1-51 against Backpage employee John Brunt.[14]

145.    In April 2018, Carl Ferrer, co-founder and CEO of Backpage, plead guilty and admitted to his role along with Backpage in money laundering and the promotion of prostitution. Part of the plea agreements in the federal action were factual recitations concerning the business

---

[13] *Id.* at 39.
[14] The superseding indictment may be accessed at this link:  https://www.justice.gov/usao-az/media/1327916/dl?inline

operations of Backpage. As relevant to the current lawsuit, Ferrer and Backpage conceded Backpage's dominant role in the promotion of commercial sex:

3 **10.** **FACTUAL BASIS**

4     a. The defendant admits that the following facts are true and that if this matter
5 were to proceed to trial the United States could prove the following facts beyond a
6 reasonable doubt:

8     The website www.Backpage.com ("Backpage") was created in 2004. It eventually
9 became the second-largest classified advertising website in the world and, during
10 its 14 years of existence, has derived the great majority of its revenue from fees
11 charged in return for publishing advertisements for "adult" and "escort" services.

13     The great majority of these advertisements are, in fact, advertisements for
14 prostitution services (which are not protected by the First Amendment and which
15 are illegal in 49 states and in much of Nevada). Acting with this knowledge,
16 certain employees and representatives of Backpage.com, LLC (who were
17 authorized to bind the company with their actions) conspired to find ways to
18 knowingly facilitate the state-law prostitution crimes being committed by
19 Backpage's customers. For example, the company utilized "moderation"
20 processes through which Backpage would remove terms and pictures that were
21 particularly indicative of prostitution and then publish a revised version of the ad.
22 Such editing did not, of course, change the essential nature of the illegal service
23 being offered in the ad—it was merely intended to create a veneer of deniability
24 for Backpage. These editing practices were only one component of an overall,
25 company-wide culture and policy of concealing and refusing to officially
26 acknowledge the true nature of the services being offered in Backpage's "escort"
27 and "adult" ads.

146. In coordination with this federal court activity, on April 9, 2018, the Backpage Defendants also entered guilty pleas in the District Court for the 94th Judicial District in Nueces

County, Texas. Specifically, each of the Backpage Defendants pleaded guilty to one count of Trafficking of Persons (Texas Penal Code § 20A.02) and one count of Engaging in Organized Criminal Activity (Texas Penal Code § 71.02). In connection with these guilty pleas, the Backpage Defendants stipulated to the following facts:[15]

> Defendant Entities did, on or about January 1, 2015, through March 31, 2015, in Nueces County, Texas, knowingly receive a benefit from participating in a venture that involved the trafficking of [REDACTED], a child younger than 18 years of age, and by any means caused [REDACTED] to engage in or become the victim of conduct prohibited by Section 43.05—Compelling Prostitution.

> Defendant Entities did, on or about September 1, 2015, through December 31, 2017, in Nueces County, Texas, with intent to establish, maintain, or participate in a combination or in the profits of a combination, the combination consisting of the Defendant Entities, Julia Dorst, Amnon Lipa, Omar Lopez-Castrillo and Vladamir Hanus, and other unnamed individuals, who collaborated in carrying on the following criminal activity:

> Money Laundering, in that the Defendant Entities knowingly acquired, maintained an interest in, concealed, possessed, transferred or transported the proceeds of criminal activity; or conducted, supervised or facilitated a transaction involving the proceeds of criminal activity; or invested, expended and received the proceeds of criminal activity or funds that Defendant Entities believed are the proceeds of criminal activity, namely: United States currency or its equivalent, and said funds were acquired or derived directly or indirectly from criminal activity, namely conduct prohibited by Texas Penal Code Section 32.32 False Statement to Obtain Property or Credit or in the Provision of Certain Services, and all proceeds of the criminal activity were related to one scheme or continuing course of conduct and the aggregate value of the proceeds is $300,000 or more.

> Money Laundering, in that the Defendant Entities knowingly acquired, maintained an interest in, concealed, possessed, transferred or transported the proceeds of criminal activity; or conducted, supervised or facilitated a transaction involving the proceeds of criminal activity; or invested, expended and received the proceeds of criminal activity or funds that Defendant Entities believed are the proceeds of criminal activity, namely: United States currency or its equivalent, and said funds were acquired or derived directly or indirectly from criminal activity, namely conduct prohibited by Texas Penal Code Section 32.35 Credit Card Transaction Record Laundering, and all proceeds of the criminal activity were related to one scheme or continuing course of conduct and the aggregate value of the proceeds is $300,000 or more.

---

[15] Nueces County, Texas Backpage Plea Agreement

147.    Finally, also as part of these coordinated federal-state efforts, on or about April 12, 2018, Backpage Principal Carl Ferrer pleaded guilty in California state court to one count of Conspiracy and three counts of Money Laundering in connection with his ownership and operation of Backpage and agreed to similar forfeiture and assistance provisions as with his federal plea agreement.

**B.    Salesforce's Knowledge of and Participation in Backpage's Promotion of Sex Trafficking.**

148.    As a fledgling company, Backpage was obsessed with growth.  Backpage met with a consultant who advised the key to Backpage's expansion was retaining existing users and targeting competing websites and recruiting new clients.  Enter Salesforce.

149.    Backpage did not have the ability to scale and operate an international sex-trafficking and sex-selling hub without operational support, marketing innovation, and guidance. Backpage sought a partnership that would assist the vision of its growth as the leader in online sex sales as well as concealing such activity including the moving of its operations offshore to evade law enforcement.

150.    Early on, Backpage boasted of its relationship with Salesforce to investors, a key factor increasing revenue growth.  This information was included in a presentation in 2014 that was contained in the Senate Subcommittee's Appendix to its report on Backpage, dated January 9, 2017:[16]

---

[16] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf, at pg. 739.

- Revenue growth is a combination of increased customers, transactions, and judicial rate increases.
- Rate increases are carefully implemented and incremental. Example, increasing a cost to post from $3 to $5. Rate increases are done to increase content quality (duplicate postings become too costly)
- 2014 has been a year for us to invest in the hardware, staff, and technology to support the larger volume of content and improve the UX experience.
Examples: Added a data center in Amsterdam, improved the ad postings architecture to support more volume, added more banks and processing choices, improved our payment service provider technology, added SalesForce, migrated to a 3rd party solution to send transactional and marketing email.

151. Prior to the time Salesforce did business with Backpage, Backpage was notorious for operating the most prolific commercial sex, trafficking, and prostitution site on the planet. The following are examples of the types of widely available information about Backpage prior to 2013:

a. National Association of Attorneys General, "Re: Backpage.com's ongoing failure to effectively limit prostitution and sexual trafficking activity on its website," (September 16, 2011). This letter was the subject of media attention and was reported in all major news outlets:



National Association of Attorneys General

PRESIDENT
Rob McKenna
*Washington Attorney General*

PRESIDENT-ELECT
Doug Gansler
*Maryland Attorney General*

VICE PRESIDENT
J.B. Van Hollen
*Wisconsin Attorney General*

IMMEDIATE PAST PRESIDENT
Roy Cooper
*North Carolina Attorney General*

EXECUTIVE DIRECTOR
James McPherson

September 16, 2011

Mr. Samuel Fifer
Counsel for Backpage.Com, LLC
SNR Denton US
233 South Wacker Drive
Suite 7800
Chicago, IL 60606-6306

**Re: Backpage.com's ongoing failure to effectively limit prostitution and sexual trafficking activity on its website**

Mr. Fifer:

This letter is in response to Backpage.com's assurances, both public and in private, concerning the company's facilitation of the sexual exploitation of children, and prostitution. As our state's chief law enforcement officers, we are increasingly concerned about human trafficking, especially the trafficking of minors. Backpage.com is a hub for such activity.

b. There were hundreds of news stories about the atrocities committed by users of Backpage, such as:

## Girls Sold for Sex Online, Backpage Defends Decision to Keep Ads Up

Megan, 17, said her pimp advertised her in a classified listing online.

By ABC News
April 24, 2012, 3:49 AM

f  X  ✉

    c.   It was widely reported that ads on Backpage were for illegal commercial sex:

## Backpage Takes Heat, But Prostitution Ads Are Everywhere

**Daniel Fisher** Forbes Staff

*I cover finance, the law, and how the two interact.*

Follow

Jan 26, 2012, 10:25am EST

    d.   It was also known that Backpage faced legal charges related to sex trafficking on their website:

## Three Teens Sue BackPage.com Over Sex Trafficking

Teens allege the site profited while they were used for prostitution.

By ABC News
July 30, 2012, 2:16 PM

f

25

152. Salesforce's hometown newspaper, the San Francisco Chronicle, published hundreds of prominent news articles concerning Backpage during the time period 2009 to 2017.[17] Every article echoed the same theme: Backpage operated an illegal cash for sex venture that victimized those posted on the site.

153. The victims on Backpage – including Plaintiffs – were all trafficked in violation of sex trafficking laws.

154. There were weekly reports of atrocities perpetrated against women and children that would not have occurred without the facilitation, enticement, solicitation, and patronization of these criminals by Backpage – with the active support of Salesforce. It is inconceivable that Salesforce was oblivious to the type of business being operated by Backpage at any time after the date Salesforce opted to invite Backpage to join the Salesforce "family".

155. Thus, by the time Salesforce elected to do business with Backpage near the end of 2013, Salesforce knew or certainly should have known of the true nature of Backpage – it was a business engaged in sex trafficking. The vast majority of victims posted on Backpage were subjected to force, fraud, and coercion or were minors; thus, the advertisement of those victims on Backpage constituted sex trafficking. A simple internet search of Backpage back in 2013 would have provided ample information on the true business purpose of the notorious company.

156. It is preposterous to imagine Salesforce, a self-proclaimed expert in "sales" and "knowing your customers," did not do a basic internet search of its new potential customer. Backpage was aggressively pursued by Salesforce ad executives not only upon original acquisition but constantly as an up sale opportunity and renewals as a current customer.

---

[17] https://www.sfgate.com/

157.     In late 2013, Salesforce knowingly entered into business with Backpage and made possible the exponential growth of Backpage's business.  The relationship lasted through 2018 despite the overwhelming and growing direct evidence in the hands of Salesforce of Backpage's criminal enterprise.

158.     Salesforce will claim it was dealing with a Backpage affiliate and not with Backpage directly; however, at all relevant times, Salesforce knew it was working directly with Backpage through communications with Backpage executives and exchanging correspondence with Backpage at its business address and email addresses (@backpage.com) and taking money directly from Backpage.

159.     Based upon information and belief, employees of Salesforce communicated and interacted with Backpage employees on a regular basis from 2013-2018.  Salesforce employees even discussed the impact of developing sex trafficking regulations on Backpage's business model.

160.     As early as 2016, Salesforce understood the negative impact of anti-sex trafficking legislation on Backpage and its business.

161.     At all relevant times, Salesforce knowingly benefitted from participating in a venture that it knew or certainly should have known was engaged in sex trafficking. For example, Backpage's CEO, Carl Ferrer, was arrested in Texas on October 6, 2016, for pimping underage children.[18] A month later, on November 17, 2016, Salesforce renewed its contract with Backpage, with Carl Ferrer signing the agreement.

162.     Based upon information and belief, Salesforce was aware of the unlawful nature of Backpage's business model and the legal challenges related to sex trafficking were part of internal Salesforce discussions.

---

[18] https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior

163.     Thus, Plaintiffs allege that Salesforce had actual awareness, knowledge, and an appreciation of the conduct in which Backpage was involved – sex trafficking.

164.     The individuals, including Plaintiffs, who were advertised on Backpage were forced to engage in commercial sex as a result of force, fraud, or coercion.

165.     Alternatively, Plaintiffs allege that Salesforce had constructive knowledge – it knew or should have known – that Backpage was engaged in illegal, immoral, and unethical business practices including, but not limited to sex trafficking.   At all relevant times, sex trafficking was pervasive on Backpage's website.

166.     Even while the United State Congress was grappling with Backpage regarding sex trafficking, Salesforce continued to offer new product suggestions, support and services to Backpage.

167.     "Backpage.com's Knowing Facilitation of Online Sex Trafficking" is a report from the U.S. Senate Permanent Subcommittee on Investigations and was released in January 2017 – during the time Salesforce maintained a continuous business relationship with Backpage.  This report detailed the criminal enterprise of Backpage and its employees.  Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for sex and that their job was to "put[] lipstick on a pig" by sanitizing them.  This was covered by every major news network across the country.  Backpage knowingly concealed evidence of criminality by systematically editing its adult advertisements and coaching its customers on how to post "clean"-looking advertisements for illegal transactions.  Thus, Backpage systematically adopted policies designed to enable and facilitate the proliferation of sex trafficking on its platform in order to maximize its profits from advertisements.

168.     At all relevant times, despite Backpage's efforts to sanitize the advertisements, Salesforce employees knew—or, at minimum, should have known—that the nature of Backpage's business was sex trafficking due to Salesforce's long-term, continuing business relationship with Backpage.    Salesforce employees engaged in phone calls, emails, in person meetings, and troubleshooting technical issues, amongst other business dealings with Backpage employees, and Salesforce was repeatedly made aware that Backpage was nothing more than an unlawful sex marketplace.

169.     Salesforce's interactions with Backpage through its initial interviews, scope of work analyses, access to the Backpage data, onboarding, integration, and continued support and its ongoing control of the CRM platform provided Salesforce with actual and constructive knowledge regarding the details of Backpage's operation.

170.     During all relevant times, Salesforce knew Backpage was in the business of selling sex through prostitution and the sex trafficking of minors and adults including Plaintiffs.

171.     Any examination of Backpage's internet operations and business needs or even a simple Google search would have established Backpage was in the business of the online selling of sex through compelled prostitution and the trafficking of persons.

172.     Salesforce's interactions with Backpage through its initial interviews, scope of work analyses, onboarding, integration, and continued support and control of the platform provided Salesforce with actual knowledge regarding the details of Backpage's operation.

**C.     Backpage and Salesforce knowingly participated and received a benefit from sex trafficking.**

173.     Salesforce created and owned and provided the technology used by Backpage to grow and expand its internet-based online selling of sex, sex trafficking, and compelled

prostitution, including the trafficking of Plaintiffs. At all relevant times, Salesforce knew or should have known that it was benefiting from Backpage's use of Salesforce's tools in sex trafficking.

174.     During initial negotiations on or about November 6, 2013, a Certified Salesforce Consulting Partner met with Backpage CEO Carl Ferrer and another high-level Backpage executive for introductions and to assess and evaluate Backpage's needs and goals. The Consulting Partner reported back to a Salesforce executive in an e-mail on November 7, 2013, that he "spent most of the time learning of [Backpage] as a business," noting the need for security and advanced integration.

175.     On or about November 12, 2013, an in-house Salesforce Account Executive confirmed ongoing conversations with the Backpage executives and was confident that the partnership would soon be consummated stating "I think this is trending strongly in our favor."

176.     In addition to creating and owning the technology, Salesforce, always, maintained the CRM platform Backpage operated from, offered ongoing support and consultation for Backpage to continue to operate and grow.

177.     The goods and services sold by Salesforce and purchased by Backpage were for Backpage use only. Salesforce did not host a platform or otherwise provide internet access or another public forum for the expression of public views, the exchange of marketable ideas, or any other publicly accessible purpose.

178.     The relationship between Salesforce and Backpage was far more expansive than the selling and the hand-off of a product. From inception of its relationship with Backpage, Salesforce, directly and/or through its agents, built Backpage's platform. Backpage could not (and did not) do it by itself. Backpage was unable to integrate and migrate its data without Salesforce's assistance.

179.    Backpage was looking for a way to recruit new customers from competitors' websites.[19]  Salesforce's technology and tools enabled them to do this while both companies' profits soared.

180.    Salesforce sold Backpage access to several products and features including, but not limited to, Salesforce's premier level product - the Enterprise Edition - and Pardot - an advanced marketing technology.  Through its specialized algorithmic formula, Pardot creates "meaningful connections, generate more pipeline, and empower sales to close more deals."

181.    Salesforce knew from the outset that Backpage could not build out Pardot on its own and as an incentive, provided and paid for implementation and build-out of Pardot for Backpage.

182.    Salesforce provided ongoing, personalized operational support for the technology, tools, and instruments that made it possible for Backpage to engage in the internet-based, online selling of sex, sex trafficking, and compelled prostitution, including the trafficking of Plaintiffs. Salesforce employees communicated directly with Backpage employees to pinpoint and resolve numerous individual technical problems that Backpage faced in employing Salesforce's technology to serve Backpage's end goals.

183.    As a result of Salesforce's tools and instruments, Backpage's business exponentially grew, requiring the scope of work covered by the Salesforce contract to grow as well with the purchasing of additional licenses, data storage, and other Salesforce features.

184.    While Salesforce sold access, at all relevant times, Salesforce ultimately retained control of the CRM tool, actively serviced the CRM platform, and accessed Backpage's data to provide technical assistance.

---

[19] New York Post, Backpage hit with new evidence it controls sex trafficking ads, link at
https://nypost.com/2017/07/11/backpage-hit-with-new-evidence-it-controls-sex-trafficking-ads/

185.     By enabling Backpage to operate, grow and market, Salesforce actively furthered the venture that violated both State and Federal sex trafficking and prostitution laws.

186.     Salesforce retained ownership and control of the platform and technology utilized by Backpage to promote, develop, and grow its internet-based online selling of sex, sex trafficking, and compelled prostitution including that of Plaintiffs.

187.     Had Salesforce wanted to stop or prevent Backpage's ability to grow, service and support its customer base (traffickers), Salesforce held the exclusive right to stop Backpage's use of Salesforce's platform.

188.     Any reasonable review of the Backpage data housed on Salesforce's servers and accessed by Salesforce employees would alert the viewer as to the involvement of trafficking. Email addresses using obvious names such as "menforhire", "pimp", "hoe", "thewhorebusiness", "escort", "partyslut", and/or "XXX" riddled the Backpage database controlled by Salesforce.

189.     As set forth in the binding Master Service Agreements ("MSA") applicable to the time period, Backpage was a customer, Salesforce retained the right to delete or restrict access to Backpage's data or platform if the actions or content of the user were found to be unlawful or tortious. Further, Salesforce retained complete ownership of its technology and products as specifically set forth in the contracts with Backpage.

190.     Additionally, the MSA or other applicable agreements required/allowed Salesforce to ensure its products were not being used for illegal purposes.

191.     To confirm compliance with the MSA and that its products were being used for legal and non-tortious purposes, Salesforce would have had to investigate the business of Backpage, the use of its technology by Backpage and the data hosted and available to Salesforce.

192. Knowing the harm that inappropriate use the Salesforce technology could cause, Salesforce promulgated an Acceptable Use Policy applying to all customers who chose to use Salesforce's proprietary software and services. Salesforce's policy specifically prohibits customers from using the Salesforce software to display, store, process or transmit, or permit use of services to display, store, process or transmit: Material that violates, encourages or furthers conduct that would violate any applicable laws, including any criminal laws, or any third-party rights, including publicity or privacy rights:



## Acceptable Use and External-Facing Services Policy

### 1. Scope

This Acceptable Use and External Facing Services Policy ("Policy") applies to customers' use of all services offered by salesforce.com, inc. or its affiliates ("SFDC").

### 5. Prohibited Material

Customers may not, and may not allow any third-party, including its users, to use services to display, store, process or transmit, or permit use of services to display, store, process or transmit:

- Material that violates, encourages or furthers conduct that would violate any applicable laws, including any criminal laws, or any third-party rights, including publicity or privacy rights.

193. Further, the Salesforce Acceptable Use Policy specifically prohibits customers from using the Salesforce technology to send or offer to send unlawful, obscene, excessively profane, or otherwise objectionable material, or promote, support or facilitate unlawful causes, or to promote, facilitate or encourage illegal activity:

33

### 6. Prohibited Actions

Customers may not use a service to, nor allow its users or any third-party to use a service to:

- Send, upload, distribute or disseminate, or offer to do the same, with respect to unlawful, defamatory, harassing, abusive, fraudulent, infringing, obscene, excessively profane, hateful, violent, or otherwise objectionable material, or promote, support or facilitate unlawful, hateful, discriminatory, or violent causes;

- Promote, facilitate or encourage illegal activity;

194. Salesforce's purported ethical standards set out in the MSA proved to be problematic to Backpage's business model, forcing Backpage to negotiate the MSA relevant to their unlawful content.

195. Negotiating the MSA was not standard practice within Salesforce, further red flagging the unique nature of the Backpage business among those Salesforce chose to partner with.

196. Despite allegedly implementing these policies to prevent unlawful usage of its products and services, Salesforce chose to accept Backpage's business in pursuit of improving their bottom line.

197. As pleaded above, Salesforce knew or should have known Backpage used its technology to promote and facilitate the selling of sex and sex trafficking. Thus, Salesforce, by accepting funds from Backpage, economically benefitted from the trafficking of Plaintiffs and the thousands of other trafficking victims Backpage exploited.

198. While all businesses are concerned about the security of their data, from inception, Backpage's obsession with security was a blatant red flag. Salesforce inherently understood that the need for security was exceedingly important to Backpage.

199. In e-mail correspondence, an in-house Salesforce executive confirmed that Backpage's needs would be best served by Salesforce's Enterprise CRM edition. As described on

its website, the Enterprise edition is "fully customizable," providing a "deeply customizable sales CRM for [Backpage]'s business".

200. As law enforcement began to close in, Backpage had active communications with Salesforce regarding the risk of exposure of its data to outside parties and inquired about the terms of disclosure.

201. Based upon information and belief, Salesforce knowingly assisted, supported, and facilitated the system reorganization and provided the technical infrastructure for Backpage to move and operate its business overseas. Salesforce addressed a unique need in Backpage's business by creating a duplicate copy of Backpage's system and in doing so directly assisted Backpage in evading law enforcement scrutiny in the United States.

202. Salesforce's ongoing and continuous relationship with Backpage spanned several nationwide law enforcement efforts and multiple civil lawsuits against Backpage, as well as a U.S. Senate investigation.

203. In 2015, Backpage was under intense public scrutiny surrounding the credit card companies' refusal to process their transactions due to the nature of Backpage's business and expressed their concerns to Salesforce. After Backpage's income decreased due to the absence of seamless credit card processing, Salesforce agreed to alter Backpage's payment structure in an attempt to help them stay afloat as they searched for solutions.

204. At anytime, when any of the multiple red flags regarding Backpage were raised, Salesforce had open access to the illegal advertisements in clear violation of trafficking laws publicly displayed on Backpage and was routinely granted access to the user data housed on Salesforce's servers.

205.    Despite having knowledge of Backpage's seizure by the U.S. Department of Justice on April 13, 2018, Salesforce continued to offer their services and even offered a renewal of the contract.

206.    Salesforce thus maintained a relationship with Backpage under circumstances and during a time period in which it is undisputed that Backpage was a venture engaged in human trafficking. Salesforce affirmatively, actively, and continuously aided, encouraged, and contributed to the success of the Backpage trafficking venture by providing critical software and support that facilitated trafficking on Backpage.

207.    It is Plaintiffs' contention that any reasonable and prudent corporation with the aptitude, expertise, and resources available to Salesforce knew – or should have known – that it was more likely than not that every person posted on Backpage was subject to force, fraud, and coercion or, worse, were minor trafficking victims.

208.    The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.[20]

209.    The constructive knowledge alleged and established in this complaint establishes that Salesforce knew or should have known of the specific violations alleged in this complaint.

210.    The allegations and evidence further establish that Salesforce knew or should have known (1) that each Plaintiff was advertised on Backpage and (2) that each Plaintiff would be forced to engage in commercial sex acts by illicit means – which is evident by the signs and

---

[20] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

symbols present in the advertisements and the overwhelming evidence known to Salesforce that they were dealing with a business whose sole purpose was sex trafficking.

**D.** **Plaintiffs are compelled into prostitution and trafficked on Backpage during its relationship with Salesforce.**

211. Beginning in 2013 through December of 2017, Plaintiff N.A.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Michigan and trafficked and facilitated by the Defendant in Chicago, Illinois.

212. Plaintiff N.A.M. was a minor during her trafficking period pled herein.

213. Beginning in 2013 through April of 2018, Plaintiff K.J.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

214. Plaintiff K.J.W. was a minor during her trafficking period pled herein.

215. Beginning in 2014 through December of 2015, Plaintiff M.J.R. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida, Alabama and Georgia and trafficked and facilitated by the Defendant in Chicago, Illinois.

216. Plaintiff M.J.R. was a minor during her trafficking period pled herein.

217. Beginning in 2013 through April of 2018, Plaintiff S.S.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in New York, Maryland and North Carolina and trafficked and facilitated by the Defendant in Chicago, Illinois.

218. Beginning in 2013 through December of 2015, Plaintiff M.S.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and trafficked and facilitated by the Defendant in Chicago, Illinois.

219. Beginning in 2013 through April of 2018, Plaintiff N.D.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California, Colorado, Nebraska and Nevada and trafficked and facilitated by the Defendant in Chicago, Illinois.

220. Beginning in 2013 through April of 2018, Plaintiff M.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in New York and trafficked and facilitated by the Defendant in Chicago, Illinois.

221. Beginning in 2013 through November of 2016, Plaintiff J.S.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia; Florida, Alabama, Missouri, New York, Virginia and Pennsylvania and trafficked and facilitated by the Defendant in Chicago, Illinois.

222. Beginning in 2013 through December of 2017, Plaintiff S.L.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Pennsylvania and Virginia and trafficked and facilitated by the Defendant in Chicago, Illinois.

223. Beginning in 2013 through January of 2015, Plaintiff S.F.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington, California, Arizona and Oregon and trafficked and facilitated by the Defendant in Chicago, Illinois.

224. Beginning in 2013 through December of 2017, Plaintiff C.I.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Illinois, Kentucky and Ohio and trafficked and facilitated by the Defendant in Chicago, Illinois.

225. Beginning in 2014 through December of 2017, Plaintiff K.M.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in New Jersey and trafficked and facilitated by the Defendant in Chicago, Illinois.

226.   Beginning in 2013 through April of 2018, Plaintiff J.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida, Ohio, Tennessee, Alabama, Connecticut, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Michigan, Missouri, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania and South Carolina and trafficked and facilitated by the Defendant in Chicago, Illinois.

227.   Beginning in 2015 through December of 2016, Plaintiff D.M.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Wyoming and trafficked and facilitated by the Defendant in Chicago, Illinois.

228.   Beginning in 2013 through March of 2015, Plaintiff M.A.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Kansas, Florida, California, Nevada and Minnesota and trafficked and facilitated by the Defendant in Chicago, Illinois.

229.   Beginning in 2013 through April of 2017, Plaintiff M.D.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and Nevada and trafficked and facilitated by the Defendant in Chicago, Illinois.

230.   Beginning in 2015 through January of 2015, Plaintiff A.H.G. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida and trafficked and facilitated by the Defendant in Chicago, Illinois.

231.   Beginning in 2013 through April of 2018, Plaintiff R.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

232.   Beginning in 2013 through January of 2017, Plaintiff R.D.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Indiana and Kentucky and trafficked and facilitated by the Defendant in Chicago, Illinois.

233.    Beginning in 2013 through December of 2017, Plaintiff D.D.J. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas, California, Florida, Louisiana and New York and trafficked and facilitated by the Defendant in Chicago, Illinois.

234.    Beginning in 2013 through December of 2015, Plaintiff A.M.J. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and Nevada and trafficked and facilitated by the Defendant in Chicago, Illinois.

235.    Beginning in 2013 through April of 2017, Plaintiff L.D.J. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Minnesota and Colorado and trafficked and facilitated by the Defendant in Chicago, Illinois.

236.    Beginning in 2015 through May of 2016, Plaintiff M.D.J. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Arizona and trafficked and facilitated by the Defendant in Chicago, Illinois.

237.    Beginning in 2013 through April of 2016, Plaintiff M.L.J. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

238.    Beginning in 2013 through April of 2018, Plaintiff K.A.J. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Ohio and trafficked and facilitated by the Defendant in Chicago, Illinois.

239.    Beginning in 2014 through September of 2016, Plaintiff N.R.K. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas, Iowa and Tennessee and trafficked and facilitated by the Defendant in Chicago, Illinois.

240.    Beginning in 2014 through December of 2017, Plaintiff C.C.K. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia and trafficked and facilitated by the Defendant in Chicago, Illinois.

241.    Beginning in 2014 through December of 2015, Plaintiff C.T.K. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Wisconsin and trafficked and facilitated by the Defendant in Chicago, Illinois.

242.    Beginning in 2013 through April of 2018, Plaintiff A.M.L. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Oklahoma and trafficked and facilitated by the Defendant in Chicago, Illinois.

243.    Beginning in 2014 through December of 2015, Plaintiff M.D.L. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Kansas and trafficked and facilitated by the Defendant in Chicago, Illinois.

244.    Beginning in 2013 through April of 2018, Plaintiff M.R.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia, New Jersey and Pennsylvania and trafficked and facilitated by the Defendant in Chicago, Illinois.

245.    Beginning in 2013 through April of 2018, Plaintiff S.A.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Arizona, California, Illinois, Massachusetts, and Nevada and trafficked and facilitated by the Defendant in Chicago, Illinois.

246.    Beginning in 2013 through December of 2016, Plaintiff C.L.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and Arizona and trafficked and facilitated by the Defendant in Chicago, Illinois.

247.    Beginning in 2015 through May of 2016, Plaintiff A.G.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and trafficked and facilitated by the Defendant in Chicago, Illinois.

248.    Beginning in 2014 through December of 2016, Plaintiff S.S.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida and trafficked and facilitated by the Defendant in Chicago, Illinois.

249.    Beginning in 2013 through December of 2017, Plaintiff A.N.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Colorado, Oregon, Nevada, California, Illinois, New York and Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

250.    Beginning in 2015 through December of 2017, Plaintiff S.A.H. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Ohio and trafficked and facilitated by the Defendant in Chicago, Illinois.

251.    Beginning in 2013 through January of 2018, Plaintiff T.D.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia, Indiana, New Mexico, North Carolina, Ohio, South Carolina, Tennessee and California and trafficked and facilitated by the Defendant in Chicago, Illinois.

252.    Beginning in 2013 through December of 2016, Plaintiff T.L.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Minnesota, Mississippi, Alabama, Georgia, Louisiana and Wisconsin and trafficked and facilitated by the Defendant in Chicago, Illinois.

253.    Beginning in 2013 through December of 2016, Plaintiff N.N.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas ana Minnesota and trafficked and facilitated by the Defendant in Chicago, Illinois.

254.    Beginning in 2015 through January of 2017, Plaintiff S.M.M was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and trafficked and facilitated by the Defendant in Chicago, Illinois.

255.    Beginning in 2013 through April of 2018, Plaintiff C.M.M was sold for sex acts by force, fraud, or coercion by the individual traffickers in Oregon and trafficked and facilitated by the Defendant in Chicago, Illinois.

256.    Beginning in 2013 through December of 2015, Plaintiff N.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida and Tennessee and trafficked and facilitated by the Defendant in Chicago, Illinois.

257.    Beginning in 2013 through April of 2018, Plaintiff A.L.M. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Massachusetts and New Hampshire and trafficked and facilitated by the Defendant in Chicago, Illinois.

258.    Beginning in 2013 through April of 2018, Plaintiff K.A.N. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California, Arizona, Colorado, Illinois, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, Texas, Utah and Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

259.    Beginning in 2013 through December of 2015, Plaintiff N.E.N. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California and trafficked and facilitated by the Defendant in Chicago, Illinois.

260.    Beginning in 2013 through December of 2017, Plaintiff S.M.N. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Oregon, California, Colorado, Minnesota, Washington and Wisconsin and trafficked and facilitated by the Defendant in Chicago, Illinois.

261.    Beginning in 2013 through April of 2018, Plaintiff D.R.N. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas, California, Colorado, Pennsylvania and Nevada and trafficked and facilitated by the Defendant in Chicago, Illinois.

262.    Beginning in 2013 through December of 2015, Plaintiff M.L.O. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida, Iowa, Missouri, Nevada, Colorado and Arkansas and trafficked and facilitated by the Defendant in Chicago, Illinois.

263.    Beginning in 2013 through April of 2015, Plaintiff N.A.O. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Indiana and Louisiana and trafficked and facilitated by the Defendant in Chicago, Illinois.

264.    Beginning in 2013 through December of 2015, Plaintiff M.E.O. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Illinois, Wisconsin and Missouri and trafficked and facilitated by the Defendant in Chicago, Illinois.

265.    Beginning in 2013 through April of 2018, Plaintiff A.G.O. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Illinois and trafficked and facilitated by the Defendant in Chicago, Illinois.

266.    Beginning in 2013 through April of 2018, Plaintiff T.K.P. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California, Louisiana, Maryland, New York and Kansas and trafficked and facilitated by the Defendant in Chicago, Illinois.

267.    Beginning in 2015 through December of 2017, Plaintiff J.A.P. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

268.    Beginning in 2013 through January of 2016, Plaintiff K.R.P. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Kentucky and Indiana and trafficked and facilitated by the Defendant in Chicago, Illinois.

269.    Beginning in 2013 through April of 2018, Plaintiff C.C.P. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia and trafficked and facilitated by the Defendant in Chicago, Illinois.

270.    Beginning in 2013 through July of 2016, Plaintiff M.L.P. was sold for sex acts by force, fraud, or coercion by the individual traffickers in South Carolina and Arkansas and trafficked and facilitated by the Defendant in Chicago, Illinois.

271.    Beginning in 2013 through December of 2015, Plaintiff P.A.S. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida and trafficked and facilitated by the Defendant in Chicago, Illinois.

272.    Beginning in 2013 through December of 2017, Plaintiff J.A.S. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia and trafficked and facilitated by the Defendant in Chicago, Illinois.

273.    Beginning in 2013 through July of 2017, Plaintiff E.J.S. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Maine and Massachusetts and trafficked and facilitated by the Defendant in Chicago, Illinois.

274.   Beginning in 2013 through December of 2015, Plaintiff A.N.T. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Michigan and trafficked and facilitated by the Defendant in Chicago, Illinois.

275.   Beginning in 2013 through February of 2017, Plaintiff S.A.T. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas, Kansas, Mississippi, Nevada, Florida, Georgia, South Carolina, Louisiana, Alabama, Pennsylvania and Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

276.   Beginning in 2013 through April of 2018, Plaintiff A.C.T. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California, Ohio, Maryland, Washington, D.C. and Michigan and trafficked and facilitated by the Defendant in Chicago, Illinois.

277.   Beginning in 2013 through December of 2016, Plaintiff B.N.T. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Georgia, California, Alabama, Colorado, Iowa and North Carolina and trafficked and facilitated by the Defendant in Chicago, Illinois.

278.   Beginning in 2013 through June of 2017, Plaintiff S.N.T. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida, Georgia and Oregon and trafficked and facilitated by the Defendant in Chicago, Illinois.

279.   Beginning in 2013 through March of 2015, Plaintiff E.E.V. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas, California, Illinois, Minnesota, Massachusetts and New York and trafficked and facilitated by the Defendant in Chicago, Illinois.

280.   Beginning in 2015 through December of 2016, Plaintiff T.J.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas and trafficked and facilitated by the Defendant in Chicago, Illinois.

281.    Beginning in 2013 through December of 2015, Plaintiff A.M.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Alabama, Kentucky and Florida and trafficked and facilitated by the Defendant in Chicago, Illinois.

282.    Beginning in 2015 through December of 2015, Plaintiff J.K.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas, Florida and Pennsylvania and trafficked and facilitated by the Defendant in Chicago, Illinois.

283.    Beginning in 2013 through December of 2015, Plaintiff N.D.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in California, Colorado, Florida, Illinois, Massachusetts, Michigan, Nevada, New Jersey, Ohio, Pennsylvania and Utah and trafficked and facilitated by the Defendant in Chicago, Illinois.

284.    Beginning in 2015 through December of 2016, Plaintiff A.D.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Illinois and Wisconsin and trafficked and facilitated by the Defendant in Chicago, Illinois.

285.    Beginning in 2013 through January of 2017, Plaintiff B.T.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in New York and trafficked and facilitated by the Defendant in Chicago, Illinois.

286.    Beginning in 2015 through December of 2017, Plaintiff R.N.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Florida and trafficked and facilitated by the Defendant in Chicago, Illinois.

287.    Beginning in 2013 through January of 2016, Plaintiff B.M.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Missouri and trafficked and facilitated by the Defendant in Chicago, Illinois.

288. Beginning in 2015 through December of 2017, Plaintiff V.F.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Arizona and trafficked and facilitated by the Defendant in Chicago, Illinois.

289. Beginning in 2013 through April of 2018, Plaintiff S.S.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Michigan and trafficked and facilitated by the Defendant in Chicago, Illinois.

290. Beginning in 2015 through April of 2018, Plaintiff A.N.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas and trafficked and facilitated by the Defendant in Chicago, Illinois.

291. Beginning in 2013 through April of 2018, Plaintiff R.C.W. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington and trafficked and facilitated by the Defendant in Chicago, Illinois.

292. Beginning in 2013 through December of 2017, Plaintiff M.T.Y. was sold for sex acts by force, fraud, or coercion by the individual traffickers in Washington, Oregon, California, Nevada and Hawaii and trafficked and facilitated by the Defendant in Chicago, Illinois.

293. Beginning in 2013 through April of 2018, Plaintiff S.R.Z was sold for sex acts by force, fraud, or coercion by the individual traffickers in Texas and trafficked and facilitated by the Defendant in Chicago, Illinois.

294. Plaintiffs' were advertised for sale on Backpage.com.

295. The advertisements were part of the venture known to engage in sex trafficking.

296. The compelled prostitution and trafficking of Plaintiffs on Backpage was made possible by the technology tools, operational support, and platform provided by Salesforce.

297.    The compelled prostitution and trafficking of Plaintiffs was facilitated by Salesforce.

298.    Plaintiffs' traffickers paid money to Backpage to post ads selling Plaintiffs for sex.

299.    Plaintiffs' advertisements were publicly posted on Backpage.

300.    The content of the advertisements selling Plaintiffs for sex contained apparent signs of sex trafficking such that Backpage knew that actual or threatened force, fraud, or coercion would be used to cause Plaintiffs to engage in commercial sex acts.

301.    Because of the relationship between Backpage and Salesforce, Plaintiffs' advertisements were accessible to Salesforce and available for Salesforce's viewing.  The content of the advertisements selling Plaintiffs for sex contained apparent signs of sex trafficking such that Salesforce knew or should have known that actual or threatened force, fraud, or coercion would be used to cause Plaintiffs to engage in commercial sex acts.

302.    These advertisements were public facing, with clear and obvious indicia of sex trafficking, and were linked to data stored within the Salesforce platform.

303.    Backpage used the Salesforce tools and technology to maintain both the details regarding the trafficking postings and the account information used to post the trafficking advertisements.

304.    Plaintiffs suffered significant physical and emotional injuries as a result of the trafficking and/or compelled prostitution complained of herein.

## VI.    CAUSES OF ACTION

### COUNT 1—SEX TRAFFICKING PURSUANT TO THE TVPRA AS TO SALESFORCE

305.    Plaintiffs incorporate all other allegations as if set forth in full herein.

306. At all relevant times, Plaintiffs were and are a victim within the meaning of 18 U.S.C. § 1595(a) because both Backpage and Plaintiffs' street-level traffickers committed violations of 18 U.S.C. § 1591 against Plaintiffs.

307. Salesforce knowingly benefitted financially from the sale of their CRM tools and technical assistance it provided to Backpage, which Salesforce knew or should have known was facilitating the sex trafficking of survivors and victims – including Plaintiffs. Salesforce benefitted both in the way of direct payments for contracts with Backpage as well as from the collection and exchange of user data.

308. More specifically, Salesforce provided its technology, products and support to Backpage a known, admitted sex trafficker and thereby knowingly assisted, supported and facilitated sex trafficking by, at a minimum, enabling Backpage to conduct the following:

  a. Gathering and managing information from traffickers' and pimps' public social media activity, including but not limited to their likes and dislikes and what they are saying and sharing about Backpage and its competitors;

  b. Developing an infrastructure for a trafficker and pimp database, as well as tracking and collecting trafficker and john data across multiple platforms including phone, email, websites and social media;

  c. Collecting traffickers' and pimps' data across multiple sources and channels and using this information to promote Backpage and the use of its services;

  d. Automatically generating insights into traffickers' and pimps' purchasing habits to help Backpage understand the traffickers better and predicting how they will feel and act so Backpage could prepare the most effective outreach;

  e. Collecting information of sex traffickers and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

  f. Analyzing information and behavior of pimps and victims to target through direct e-mail campaigns to advertise and promote illegal prostitution;

  g. Utilization of cloud storage to store (and secure) operational database and information;

h.  Designing and implementing the system used by Backpage in the solicitation and expansion of sales opportunities to traffickers and pimps;

i.  Improving and implementing the solicitation of referrals from existing traffickers and pimps using Backpage by creating cross-selling and upselling opportunities;

j.  Duplication of operating system to evade law enforcement in or around 2015; and

k.  System modification to enable operation from three continents.

309.  During the period that Plaintiffs were trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager and operator of the platform and technology that allowed Backpage to promote the trafficking and prostitution of others including Plaintiffs.

310.  Plaintiffs seek to hold Salesforce accountable for its own, independent actions that aided in the trafficking of persons including Plaintiffs.

311.  Plaintiffs do not, in any way, seek to treat Salesforce as a publisher or speaker. Rather, they are pursuing claims against Salesforce that do not implicate the Communications Decency Act, 47 U.S.C. § 230(c)(1).

312.  Salesforce is also directly liable to Plaintiffs (N.A.M.), (K.J.W.), and (M.J.R.) under 18 U.S.C. § 2255.

## VII.  DAMAGES

313.  Salesforce's acts and omissions, individually and collectively, caused Plaintiffs to sustain legal damages.

314.  Plaintiffs are entitled to be compensated for personal injuries and economic damages, including:

a.  Actual damages;

b.  Direct damages;

c.  Incidental and consequential damages;

      d.      Mental anguish and emotional distress damages (until trial and in the future); and

      e.      Punitive damages.

315.    Plaintiffs are entitled to exemplary damages by statute.

316.    Plaintiffs are entitled to recover attorneys' fees and costs of court.

317.    Plaintiffs are entitled to pre- and post-judgment interest at the maximum legal rates.

## VIII.   JURY TRIAL

318.    Plaintiffs demand a jury trial on all issues.

## IX.   RELIEF SOUGHT

319.    Wherefore, Plaintiffs respectfully request judgment against the Defendant for actual damages in excess of the minimum jurisdictional limits of this Court, pre- and post-judgment interest as allowed by law, costs of suit, attorney fees and all other relief, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

By: /s/ *David E. Harris*
      SICO HOELSCHER HARRIS LLP
      David E. Harris
      State Bar No. 24049273
      Craig M. Sico
      IL State Bar No. 90785913
      819 N. Upper Broadway
      Corpus Christi, Texas 78401
      Telephone: (361) 653-3300
      Facsimile: (361) 653-3333
      dharris@shhlaw.com
      csico@shhlaw.com
      harrisht@shhlaw.com

      and

      ANNIE MCADAMS, PC
      Annie McAdams
      *Pro Hac Vice Pending*
      2900 North Loop West, Suite 1130

Houston, Texas 77092
Telephone: (713) 785-6262
Facsimile: (866) 713-6141
teamamc@mcadamspc.com

**ATTORNEYS FOR PLAINTIFFS**